UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 14-1853 (L)
(7:10-cv-02097-MGL)

_____

First South Bank,

        Plaintiff – Appellant,

v.

Fifth Third Bank NA,

        Defendant – Appellee.

_____

Appeal From The United States District Court
For The District Of South Carolina

_____

**Brief of Appellant First South Bank (Page-Proof)**

_____

Joel W. Collins, Jr.
Collins and Lacy, P.C.
Post Office Box 12487
Columbia, South Carolina 29211
(803) 256-2660

Robert F. Goings
Goings Law Firm, LLC
Post Office Box 436
Columbia, South Carolina 29202
(803) 350-9230

Counsel for Appellant First South Bank

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................... iv

CORPORATE DISCLOSURE STATEMENT ........................................... vii

JURISDICTIONAL STATEMENT ............................................................ viii

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ................. ix

STATEMENT OF THE CASE .....................................................................1

   I.       Description of Procedural History ...............................................1

   II.      Statement of Facts ......................................................................3

          a.     Fifth Third's False and Deceptive
                Representations as to Sewer Availability ........................5

          b.     Fifth Third's Failure to Obtain the
                Tyson Guaranty and Falsification of
                Loan Documents ...........................................................10

          c.     Fifth Third's Improperly Closed the
                 Loan ...............................................................................13

SUMMARY OF ARGUMENT ...................................................................14

ARGUMENT ............................................................................................16

   I.       The District Court Erred in Entering Judgment Against
          First South on the NCUDTPA Cause of Action .....................16

          A.     North Carolina Law Applies to the NCUDTPA
               Cause of Action ............................................................16

1.  The Substantive Law of North Carolina
    was Applied Throughout the Litigation ...............17

2.  The Agreement Required the Application
    of North Carolina Law ...........................20

3.  *Lex Loci Delicti* Required the Application
    of North Carolina Law ...........................22

B.  Fifth Third Violated The NCUDTPA.............................25

1.  The Jury's Finding of Fraud Established a
    NCUDTPA Violation as a Matter of Law............26

2.  The Evidence Presented at Trial Demonstrated
    Fifth Third's Unfair and Deceptive Actions
    Proximately Caused Injury to First South ............29

3.  First South Did Not Stipulate to Damages
    in a Manner that Precludes a Finding of
    Liability Under the NCUDTPA ...........................30

C.  The Evidence Established Fifth Third Violated the
    SCUTPA...................................................38

1.  The Evidence Established Fifth Third
    Engaged in Unfair or Deceptive Acts
    in the Conduct of Trade or Commerce.................39

2.  The Evidenced Proved Fifth Third's
    Unfair and Deceptive Acts Affected
    the Public Interest...................................41

3.  First South Suffered an Ascertainable
    Loss ....................................................44

4.    The District Court Erred in Denying First
South the Right to Present a SCUTPA
Claim to the Jury ...................................................46

II.    The District Court Erred in Denying Mandatory
Prejudgment Interest to First South.........................48

A.    First South is Entitled to Prejudgment Interest on
the Breach of Contract Cause of Action........................52

B.    First South is Entitled to Prejudgment Interest
on the Fraud Cause of Action .........................................53

CONCLUSION ...........................................................54

REQUEST FOR ORAL ARGUMENT..........................................54

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allen v. Zurich Ins. Co.*, 667 F.2d 1162 (4th Cir. 1982) ..........................19

*Beattie v. Nations Credit Fin. Servs. Corp.*, 69 F. App'x 585 (4th Cir. 2003) .......39

*Bernard v. Central Carolina Truck Sales, Inc.*,
   314 S.E.2d 582 (N.C. Ct App. 1984) ...........................................21, 36

*Bhatti v. Buckland*, 400 S.E.2d 440 (N.C. 1991) .............................26, 27, 28, 42

*Bilancia v. Gen. Motors Corp.*, 538 F.2d 621 (4th Cir. 1976) ....................19

*Boddie-Noell Props. Inc. v. Magnolia P'Ship.*,
   544 S.E.2d 279 (S.C. Ct. App. 2000) ...........................................45

*Brendle v. General Tire and Rubber Co.*, 408 F.2d 116 (4th Cir. 1969) ...............22

*Broussard v. Meineke Discount Muffler Shops*,
   958 F. Supp. 1087 (W.D.N.C. 1997) ...........................................51

*Brown v. Flowe*, 507 S.E.2d 894 (N.C. 1998).......................................50

*Bryant v. Reedy*, 200 S.E. 896 (N.C. 1938).......................................31

*Canady v. Mann*, 419 S.E.2d 597 (N.C. 1992) .....................................36

*Castles Auto & Truck Serv., Inc. v. Exxon Corp.*,
   16 F. App'x 163 (4th Cir. 2001) ...........................................49

*City of Charleston, S.C. v. Hotels.com, LP*, 520 F.Supp.2d 757 (D.S.C. 2007) .....39

*Collins Holding Corp. v. Defibaugh*, 646 S.E.2d 147 (S.C. Ct. App. 2007) ..........45

*Compton v. Kirby*, 577 S.E.2d 905 (N.C. Ct. App. 2003)...........................28

*Dailey v. Integon General Ins. Corp.*, 331 S.E.2d 148 (N.C. Ct. App. 1985) ........49

*Daisy Outdoor Adver. Co., Inc. v. Abbott*, 473 S.E.2d 47 (S.C. 1996) .................41

*Davis v. Sellers*, 443 S.E.2d 879 (N.C. 1994).......................................27, 28

*deBondt v. Carlton Motorcars, Inc.*, 536 S.E.2d 399 (S.C. Ct. App. 2000) .....39, 42

*Douglas v. Doub*, 383 S.E.2d 423 (N.C. Ct. App. 1989) ..................................28, 32

*Dowd v. Imperial Chrysler-Plymouth, Inc.*,
   381 S.E.2d 212 (S.C. Ct. App. 1989)...........................................45

*Edwards v. West*, 495 S.E.2d 920 (N.C. Ct. App. 1998)...........................28

*Ellis v. Smith-Broadhurst, Inc.*, 268 S.E.2d 271 (N.C. Ct. App. 1980) .................29

*G ex rel. RG v. Fort Bragg Dependent Schools*, 343 F.3d 295 (4th Cir. 2003)......48

*Godfrey v. Res-Care, Inc.*, 598 S.E.2d 396 (N.C. Ct. App. 2004) .........................31

*Goldman v. Parkland of Dallas, Inc.*, 176 S.E.2d 784 (N.C. 1970)......................22

*Gray v. N.C. Ins. Underwriting Ass'n*, 510 S.E.2d 396 (N.C. Ct. App. 1999) .......25

*Hamby v. Williams*, 196 N.C. App. 733, 676 S.E.2d 478 (N.C. Ct. App. 2009) ....49

*Hines v. IBG Intern., Inc.*, 813 F.2d 1331 (4th Cir. 1987) ...........................46

*Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614 (4th Cir. 1999) ..........21, 52

*In re Charlotte Commercial Grp., Inc.*, 288 B.R. 715 (Bankr. M.D.N.C. 2003)....48

*In re Merrit Dredging Co., Inc.*, 839 F.2d 203 (4th Cir. 1988)..............................23

*Jones v. Harrelson & Smith Contractors, LLC,*
670 S.E.2d 242 (N.C. Ct. App. 2008) ......................................................28

*Jordan v. Shaw Indus., Inc.,*
Nos. 96-2189, et. al., 1997 WL 734029 (4th Cir. Nov. 26, 1997) ......................22

*Kim v. Prof'l Bus. Brokers, Ltd.*, 328 S.E.2d 296 (N.C. Ct. App. 1985) ...............27

*Laird v. Nationwide Ins.*, 134 S.E.2d 206 (S.C. 1964)...........................................31

*Lee v. Keck*, 315 S.E.2d 323 (N.C. Ct. App. 1984)................................................26

*Liberty Mut. Ins. Co. v. Employee Resource Mgmt., Inc.,*
176 F. Supp. 2d 510 (D.S.C. 2001) ........................................................47

*Market Am., Inc. v. Rossi*, 104 F. Supp. 2d 606 (M.D.N.C. 2000) ........................53

*Media Network, Inc. v. Long Haymes Carr, Inc.,*
678 S.E.2d 671 (N.C. Ct. App. 2009).....................................................27

*Mellon Investor Servs., LLC v. Longwood Country Garden Ctrs., Inc.*, 263 Fed.
Appx. 277 (4th Cir. 2008)........................................................20

*Metromont Materials Corp. v. R.B.R. & S.T.,*
463 S.E.2d 305 (N.C. Ct. App. 1995)
*rev. denied by* 467 S.E.2d 903 (N.C. Ct. App. 1996) ..........................................49

*Mizell v. Eli Lilly & Co.*, 526 F. Supp. 589 (D.S.C. 1981) ................................22

*Monsanto Co. v. Are-108 Alexander Rd., LLC,*
C/A 1:10CV898, 2013 U.S. Dist. LEXIS 40935 (M.D.N.C. Mar. 25, 2013)......49

*Noack Enters., Inc. v. Country Corner Interiors of Hilton Head Island, Inc.,*
351 S.E.2d 347 (S.C. Ct. App. 1986)........................................................38

*Noland Co. v. Graver Tank & Mfg. Co.*, 301 F.2d 43 (4th Cir. 1962)....................22

*Oshiek v. Oshiek*, 136 S.E.2d 303 (S.C. 1964)................................................22

*Payne v. Holiday Towers, Inc.*, 321 S.E.2d 179 (S.C. Ct. App. 1984) ..................45

*Pearce v. Am. Defender Life Ins. Co.*, 343 S.E.2d 174 (N.C. 1986)......................27

*Provident Fin., Inc. v. Strategic Energy L.L.C.,*
404 Fed. Appx. 835 (5th Cir. 2010)........................................................20

*Richmond v. Madison Mgmt. Group, Inc.*, 918 F.2d 438 (4th Cir. 1990)..............44

*Sec. Ins. Co. v. Arcade Textiles, Inc.*, 40 Fed. Appx. 767 (4th Cir. 2002) .............49

*Spartan Leasing, Inc. v. Pollard*, 400 S.E.2d 476 (N.C. Ct. App. 1991)................26

*Spivey v. United States*, 912 F.2d 80 (4th Cir. N.C. 1990).....................................25

*Taha v. Thompson*, 463 S.E.2d 553 (N.C. Ct. App. 1995)...........................49, 50

*Tradewinds Airlines, Inc. v. C-S Aviation Servs.,*
733 S.E.2d 162 (N.C. Ct. App. 2012).............................................30, 31, 32

*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.,*
352 F.3d 908 (4th Cir. 2003) ........................................................16

*Vaught v. A.O. Hardee & Sons, Inc.*, 623 S.E.2d 373 (S.C. 2005) ........................31

*Walker v. Fleetwood Homes of N. Carolina, Inc.*,
    653 S.E.2d 393 (N.C. 2007)..................................................16, 46, 47
*Walter E. Heller & Co. v. Video Innovations, Inc.*,
    730 F.2d 50 (2nd Cir. 1984).............................................................20
*Winant v. Bostic*, 5 F.3d 767 (4th Cir. 1993) .................................18, 37
*Wright v. Craft*, 640 S.E.2d 486 (S.C. Ct. App. 2006)....................38, 46
*York v. Conway Ford, Inc.*, 480 S.E.2d 726 (S.C. 1997) .................42, 43

**Statutes**
28 U.S.C. § 1291 ......................................................................... vii
28 U.S.C. § 1332 ......................................................................... vii
S.C. Code Ann. § 39-5-140 ..........................................................38, 45
S.C. Code Ann. § 39-5-10 .................................................................40
S.C. Code Ann. § 39-5-20 .................................................................38


**Other Authorities**
Restatement (Second) of Conflict of Laws § 145 (1971)........................23
*Black's Law Dictionary* 394 (7th ed. 1999) ........................................31


**Rules**
Fed. R. App. P. 4 ........................................................................ vii
Fed. R. Civ. P. 43 ............................................................................25
N.C.G.S § 10 ........................................1, 12, 15, 26, 27, 28, 36, 37, 40
N.C.G.S. § 24 ......................................................16, 48, 49, 52, 53

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1 and Local Rule 26.1, First South Bank, who is the Appellant, makes the following disclosure:

1. Is the party a publicly held corporation or other publicly held entity? No.

2. Does the party have any parent corporations? Yes, First South Bancorp, Inc.

3. Is 10% or more of the stock of the party owned by a publicly held corporation or other publicly held entity? Yes, First South Bancorp, Inc.

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? No.

5. Is the party a trade association? No.

6. Does this case arise out of a bankruptcy proceeding? No.

## JURISDICTIONAL STATEMENT

First South Bank ("First South") is a South Carolina corporation, with its principal place of business in Spartanburg, South Carolina. Fifth Third Bank, N.A. ("Fifth Third") is a national banking association. Fifth Third is a successor by merger with First Charter Bank of North Carolina. The amount in controversy exceeded seventy-five thousand dollars. Accordingly, the United States District Court for the District of South Carolina had subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

First South timely filed a notice of appeal on August 20, 2014, in accordance with Fed. R. App. P. 4(a)(1)(A), and Fed. R. App. P. 4(a)(4). First South appeals the following final orders and judgments: (a) the Order Denying Plaintiff's Claim for Violation of the North Carolina Unfair and Deceptive Trade Practice Act of September 30, 2013; (b) the Opinion and Order of August 6, 2014 denying Plaintiff's Motion for Reconsideration and to Alter or Amend Judgment Related to Violation of the Unfair and Deceptive Trade Practice Act Cause of Action, and Plaintiff's Motion to Alter or Amend Judgment for Entry of Pre-Judgment Interest. Accordingly, the United States Court of Appeals for the Fourth Circuit has jurisdiction pursuant to 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>

1. Did the District Court err in entering judgment against First South on the cause of action for violation of the NCUDTPA when the jury found Fifth Third committed Fraud?

2. Did the District Court err in failing to award mandatory prejudgment interest to First South?

## STATEMENT OF THE CASE

### I.    Description of Procedural History

This case involves Fifth Third's fraudulent inducement of First South to participate in a commercial loan to develop a residential subdivision known as Burton Creek.  First South filed this action against Fifth Third on August 11, 2010. (Dkt. 1, Complaint). The causes of action alleged were (1) breach of contract, (2) breach of contract accompanied by a fraudulent act, (3) gross negligence, (4) misrepresentation, (5) fraud, and (6) violation of the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"). (Dkt. 72; Dkt. 212; Dkt. 213; Trs. p 8:20-9:22).

The jury trial was held on September 12, 2013 through September 25, 2013. The District Court directed a verdict in favor of Fifth Third on the causes of action for gross negligence and misrepresentation. (Trs. p. 1502:24-1503:6). The parties agreed the Court would decide the NCUDTPA claim as required by North Carolina law. (Trs. p. 1503:7-11; 1660; 1663-1665). The remaining causes of action for breach of contract, tortious breach of contract, and fraud were submitted to the jury.  First South sought damages for the money it lost in this transaction.

On September 25, 2013, the jury found that Fifth Third committed breach of contract and fraud. (Dkt. 240). The jury assessed damages in the amount of $2,368,232.46, and awarded $396,000.00 in punitive damages. (Dkt. 240).

Following the verdict, First South filed a Motion for Entry of Judgment on the NCUDTPA claim as directed by the court. (Dkt. 241). On September 30, 2013, the District Court issued an Order denying this motion. (Dkt. 242). The District Court found that (1) First South failed to state a claim because South Carolina law applied to any unfair or deceptive acts by Fifth Third; (2) First South did not offer sufficient evidence at trial to prove a violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"); and (3) even if North Carolina law applied, First South did not offer sufficient evidence at trial to prove a violation of the NCUDTPA. (Dkt. 242). Thereafter, the District Court entered judgment in favor of First South in the amount found by the jury. (Dkt. 243).

On October 28, 2013, First South filed a Motion for Reconsideration of the Order denying relief under NCUDTPA. (Dkt. 263). First South also filed a Motion to Alter or Amend Judgment for Entry of Pre-Judgment Interest. (Dkt. 264). A hearing was scheduled on February 24, 2014. (2/24/14 Hr. Trs. p. 54-98). By Order dated August 6, 2014, First South's post-trial motions were denied. (Dkt. 292). This appeal follows.

## II.    Statement of Facts

This case arises out of a Participation Agreement ("Agreement") that Fifth Third[1] induced First South to enter into through acts of concealment, material misrepresentation, and fraud.   The Agreement was to jointly finance an $11,000,000.00 loan to Burton Creek Investment, LLC for the construction of a 204 lot residential subdivision in Lincoln County, North Carolina ("Burton Creek loan" or "Loan"). (Trs. p. 168; Pls. Ex. 2).

In 2006 and 2007, Jesse Milliken, commercial loan officer for Fifth Third, was presented with an opportunity to originate a multi-million dollar loan for the development of Burton Creek. This was the largest loan in Mr. Milliken's career, and he stood to generate substantial commissions and promotions in closing this transaction. (Tr. 873-890, 1622-1623; Pls. Ex. 75, 76, 77, 78, 79, 80).   Milliken was competing against another lender for this loan. (Tr. p. 907-908, 963). However, Fifth Third would only approve this loan if Milliken could sell a participation interest to another bank to minimize exposure.  (Trs. p. 873).

On March 7, 2007, First South entered into the Agreement with Fifth Third to finance 36%, or $4,000,000.00 of the Loan. (Pls. Ex. 2). Fifth Third was the "lead bank." (Trs. 143). First South was the "participating bank." (Trs. p. 143).

---

[1] Fifth Third Bank acquired First Charter Bank of North Carolina through a merger in June 2008, assuming all of its assets and liabilities.  For consistency, First South

Fifth Third was responsible for obtaining documentation required for credit underwriting, the closing, ensuring that conditions precedent to the loan were met, and servicing of the Loan.  (Trs. 142-160). For participation loans, the customary and common practice is for the participant bank to rely on the underwriting materials and representations provided by the lead bank. (Tr. 174-192, 196-199, 202-222, 224-225, 256-258, 285-300, 352, 436-429, 530, 554, 698-699, 735, 942, 1048-1049).

Several months before the closing, Fifth Third courted First South to participate in this loan. In an effort to induce First South to become a participant, Fifth Third made representations of material conditions precedent concerning the ability to develop the subdivision, the financial strength of the borrowers, and the collateral.  (Id.). As explained below, Fifth Third represented to First South that it had obtained sewer approval from Lincoln County, North Carolina for 204 lots and that a wealthy and prominent real estate developer, Carlton Tyson, had signed a personal guaranty to secure the loan.  Based on these important pre-conditions to funding that Fifth Third represented had been completed, First South entered into the Agreement and funded the loan.  (Trs. p. 1561-1564)  Milliken was ultimately fired based on his mishandling of this loan. (Trs. p. 1484-1486). Fifth Third continued to actively withhold material information about the loan.  (Trs. p. 307-314, Pls. Ex. 45, 61).  Fifth Third told First South there were "no issue[s] with the

loan" and "no covenant violations." When First South would press for information and answers, Fifth Third sent internal emails stating "I know it is sensitive as to what we should or should not tell [First South]." (Trs. p. 1096-1098, 1129-1132; Pls. Ex. 67). The material misrepresentations that induced First South to enter into the Agreement were as follows:

> **(a)    Fifth Third's False and Deceptive Representations as to Sewer Availability.**

First South agreed to participate in the loan by relying on Fifth Third's express representations that sewer service was available for the 204 lots. (Trs. p. 173-174, 177, 182, 185, 202-225, 243-253; 264-266; 735; Pls. Ex. 1, 3, 24, 26, 27). These representations were false.

For purposes of soliciting a participation interest, Fifth Third provided First South with a copy of the Burton Creek loan package, which indicated the principal source of repayment of the Loan would be the sale of 204 lots to builders. (Trs. p. 157-158, 177, 457, 487, 728, 912, 915; Pls. Ex. 1, 3, 24, 26, 27). The loan package further indicated that Burton Creek would have sewer availability in adequate capacity for the 204 lots. (Id.). For a residential subdivision, evidence of pre-existing sewer availability for each lot developed is essential to the success of the project and repayment of the loan. (Id.). Lots cannot be released to a builder without sewer approval. If lots cannot be sold, the principal source of repayment of

this loan is substantially impaired. (Tr. 915-917). Consequently, evidence of sewer availability was an express condition precedent to entering into the Loan.

Fifth Third's "Credit Risk Policy Manual" required evidence of utilities as a condition precedent for a residential subdivision development loan  (Tr. p. 898-901, 922-924, 1365-1366; Pls. Ex. 7).  The policy stated that availability of water and sewer utilities in adequate capacity is "critical" and the letters evidencing utilities are "required as part of the closing documents. (Id.).  Additionally, Fifth Third's policy for "Land Acquisition & Development" provided it must "verify and document" all necessary governmental approvals have been obtained, including water and sewer availability.  (Trs. p. 926; Pls. Ex. 7).

At all times *prior to* and *after* the execution of the Agreement, Fifth Third represented to First South that written evidence of utilities had been obtained for the 204 lots as a *condition precedent*:

> 1. **Credit Memorandum**: In the Credit Memorandum provided to First South, Fifth Third stated the 204 lots were to have access to "municipal water and sewer." (Pls. Ex. 24). As a "condition" to the participation loan, Fifth Third represented that it "must receive and approve the following items prior to closing," which specifically included "Utilities Approval." (*Id.* p 11). The cost estimates for this project that First South reviewed had costs associated with obtaining sewer availability for each lot.  (Pls. Ex. 27).

2. **Commitment Letter**: The commitment letter, dated February 22, 2007, and provided to First South, stated that evidence of utilities for the 204 lots was a "Condition Precedent." (Pls. Ex. 1). The paragraph of the letter captioned "<u>Condition Precedent</u>" provided "the Bank's loan commitment is subject to fulfillment of the following additional conditions precedent: c. <u>Utilities</u>: Evidence acceptable to the Bank of on-site availability of all utility services necessary for the construction and operation of the Project and its intended uses."

3. **Loan Agreement**: The Loan Agreement represented that evidence of utilities was obtained as a "condition precedent" of the Loan. (Pls. Ex. 3). Article III of the Loan Agreement, captioned as "Condition Precedent to Disbursement," provides that Loan proceeds would not be disbursed until "(t) Defendant shall have received and approved…(ii) letters from the applicable utility companies or governmental authorities confirming that all utilities necessary for the Improvements (defined as 204 single family lots) are available at the Land in sufficient capacity, together with evidence satisfactory to Bank of paid impact fees, utility reservation deposits, and connection fees required to assure the available of such service." (Id. p. 10). Further, the Loan Agreement contains "Representation and Warranties" that "All utility services necessary for the development of the Land and the Lots are available at the boundaries of the Land, including electric and natural gas facilities, telephone service, water supply, storm and sanitary sewer facilities." (Id. p. 13).

4. **Closing Checklist**: Fifth Third provided First South with a "Closing Checklist" prepared by the Defendant dated March 8, 2007 that confirmed evidence of utilities for sewer was "Received." (Ps. Ex. 43). The Closing Instruction Letter provided that preconditions of the closing, i.e., would be obtained prior to closing.

5. **Agreement**: In the Agreement, Fifth Third "represent[ed] and warrant[ed]" that it had in its possession the loan documents, and all documents delivered in connection with the Loan. (Pls. Ex. 2 ¶ 1, 4(a)). Written evidence of sewer availability was required to be delivered in connection with Loan. Fifth Third also represented that the Loan was not in default, but lack of requisite sewer availability was an event of default. (Id. ¶ 4; Pls. Ex. 3, ¶ 6.1).

7

Contrary to Defendant's representations to First South and the requirements of the Agreement, the Credit Agreement, the Loan Agreement, and Fifth Third's internal policies, the Burton Creek subdivision lacked requisite sewer availability. Rather, this phase 204 lot subdivision lacked sewer approval, and only had the ability to sell 74 lots for all phases of the entire 385 lot subdivision. (Trs. p. 760-772, 1544-1545; Pls. Ex. 5, 6). Based on the lack of this material precondition requirement, the loan never should have closed and was in default before it was sold to First South. (Tr. 197; 255-256; 911-913; 917-918 1052-1055; 1092). First South would not have participated in this loan if the lack of sewer permitting was disclosed. (Trs. 173-174, 195, 198, 1092, 1132, 1163).

Fifth Third knew or should have known of the lack of sewer availability, and yet, failed to inform First South. The loan documents and Fifth Third's banking policies required it to obtain sewer approval as a condition precedent. (Trs. 1342-1373; Pls. Ex. 1, 3, 24, 26, 27) However, more than one month before the closing, Lincoln County issued a letter on February 5, 2007 stating it could only provide sewer service to 74 lots, *not* the required 204 lots. (Trs. p. 764-772; 1469-1470; Pls. Ex. 5, 6). Lincoln County did not commit to provide any additional sewer taps. (Trs. p. 764-772). Importantly, Fifth Third sent internal emails indicating that evidence of utilities was "missing" from the Burton Creek file after closing.

8

Importantly, Fifth Third never told First South about the missing documentation. (Trs. 1093-1098; 1258; Pls. Ex. 12).

On July 1, 2008, more than a year later, Fifth Third disclosed to First South that the subdivision was significantly delayed. Fifth Third blame the delay on Lincoln County imposing a moratorium on sewer availability. (Trs. p. 272-275, 1098-1100, 1126-1128, 1198-1199). However, rather than disclosing the limitation was imposed *prior to* the closing of the Loan, Fifth Third falsely claimed that Lincoln County had "recently" imposed a "sewer moratorium" limiting it to 74 lots. (Trs. 273-274, 585-586, 599; 1551-1552, 1133-1134, 1352-1354; 1434, Pls Ex. 16, 18.). The evidence shows that Fifth Third represented to First South that the "sewer moratorium" occurred in October 2007, instead of before the closing. (Id).

Ultimately, the lack of sewer availability prevented the subdivision from being developed and caused the Loan to go into default. Internal documentation confirms the lack of sewer service prevented Burton Creek from selling lots before the maturity date of the Loan. (Trs. p. 495, 1342-1349-1372, 1539-1541; Pls. Ex. 16, 18, 19, 20). The inability to sell lots without sewer also affected the borrower's repayment of the Loan because the sale of lots was the principal source of repayment. (Tr. p. 915-918). Fifth Third even conceded the lack of sewer was a material default of the loan, finding the Burton Creek loan was in default because

only 74 lots had sewer service. (Trs. 1356-1357; Pls. Ex. 17). However, at trial Fifth Third pretended that sewer had nothing to do with the failure of the loan. (Trs. p. 1342-1349; 1539-1545).

> **(b)** **Fifth Third's Failure to Obtain the Tyson Guaranty and Falsification of Loan Documents.**

Fifth Third also represented to First South the loan would be secured by an executed Personal Guaranty of Mr. and Mrs. Carlton Tyson ("Tyson Guaranty"). (Trs. p. 168-171, 174, 177-179, 191-192, 195-196, 198, 209-211, 225, 247, 265-266, 269-270, 290-291, 303-306, 336, 354-355, 430, 515, 592-593, 695, 713-714, 907, 945, 947-948; Pls Ex. 24, 26). The Tyson Guaranty was necessary to the approval of this Loan because the Tysons have "significant wealth" totaling over $76 million dollars.  (Trs. p. 265, 291, 904-909, 1005).   The Tysons had the wherewithal to make the project successful and the assets to satisfy any default of the Loan or judgment obtained on his guaranty.  (Id.).   As such, the Tyson Guaranty was a "condition precedent" of disbursement of the loan funds.  (Trs. p. 198-199, 907; Pls. Ex. 1, 3, 24, 26, 27).   The Tyson Guaranty was a critical and material document to this transaction.  (Tr. p. 290-291, 303-304, 906-907, 916-917, 948, 950; 1003-1005). Fifth Third admitted that the loan should not have closed without the Tyson Guaranty as collateral.  (Trs. 1004-1005).

Fifth Third expressly represented to First South in the Commitment Letter, the Credit Memorandum, and the Participation Agreement that the guaranty would be signed before the Loan was closed.  (Pls. Ex. 1, 2, 24). In fact, after the closing Fifth Third expressly represented to First South that the Tyson Guaranty was executed. (Pls. Ex. 2, 3, 48). First South had every reason to expect that the guaranty agreement would be properly executed prior to the disbursement of the funds.

In actuality, the Tyson Guaranty was ***never*** executed.  (Trs. p. 621, 626-630; 649-650, 721, 949-950, 956, 1061). The Tysons claimed their signatures were forged. (Trs. 318, 666, 695, 747, 1168).[2]  Milliken was not called to testify by Fifth Third to answer if he forged the Tyson Guaranty.  The circumstantial evidence suggested that he was responsible for forging the Tysons' signatures. (Trs. p. 603-609; 949-950). What is clear, however, is that Tyson did not sign the Guaranty and Milliken instructed his assistant, Brenda Cobb, to falsify the notarization to the Tyson Guaranty. (Trs. p. 603-609, 910-911). According to Brenda Cobb, she was instructed by Milliken to falsely notarize the Tyson Guaranty using a date of March 8, 2007. (Trs. p. 603-609; 949-950; Pls. Ex. 46). On the signature page of the Tyson Guaranty, she swore that the Tysons appeared personally before her to

---

[2] Another document required to be executed before the Loan closed was a mechanics lien waiver from a clearing and grading company, McCullum Trucking. McCullum Truck also claimed the mechanic's lien waiver was also forged.  (Trs. p. 317-319; 1139-1140; Pls. Ex. 54).

execute the document. However, at trial she admitted that this was false and the Tysons never signed the Tyson Guaranty. (Id.). This is a felony in North Carolina pursuant to N.C.G.S § 10B-60, as judicially noted at trial. (Trs. 633, 638; Pls. Ex. 88).

Brenda Cobb testified falsifying notaries to loan documents was a routine and common practice of Fifth Third bank employees. Ms. Cobb testified that she had previously complained about Fifth Third's routine policy of requiring loan assistants to notarize documents without the signatory present and should be prohibited. (Trs. p. 603-609). Fifth Third had this policy, even though its loan manual required "All documents should be signed in the presence of a Bank representative or an attorney acting on behalf of the Bank and notarized when applicable." (Tr. p. 944-948, 951-952; Pls. Ex. 7). Furthermore, Fifth Third was on notice of repeated practices of its loan officers disbursing funds without obtaining critical loan documents. (Tr. p. 952-953). The unwavering evidence proved this was Fifth Third's common and routine practice, and that falsified documents and notarizations occurred many times. (Trs. p. 603-609).

Fifth Third failed to disclose to First South the Tyson Guaranty was not obtained and never signed prior to or at the closing. (Trs. p. 1134, 1136). However, the clear evidence proved that Fifth Third knew the Tyson Guaranty was missing. (Trs. p. 949-950). In a March 14, 2007 letter, Fifth Third's closing

attorney advised "I have not received the…Guaranty Agreement of Carlton & Carol Tyson," followed by a March 16, 2007 email from Milliken that he was "not aware [the Tysons] signed the guaranty." (Pls. Ex. 38, 51). Yet, Fifth Third never told First South about the missing guaranty. Instead, it deceitfully continued to request funding from First South. First South first discovered this irregularity in April 2010, three years after the loan was made. (Tr. 1060-1061, 1068-1071, 1084-1091, 1134). First South would not have accepted a participation interest in the Loan if Fifth Third would have properly informed it that the Tysons would not, or did not, execute their personal guaranty.

### (c)    Fifth Third's Improperly Closed the Loan

The purported closing of the Loan was conducted in a deceitful and grossly improper manner. Fifth Third supervised the closing and was "fully aware" of how the loan would be closed. (Trs. p. 665; 894-895). First South was told that loan would be closed by neutral and disinterested outside counsel. (Trs. p. 264, 943-944, 1088-1091; Pls. Ex. 57). Fifth Third represented that an independent attorney named J. Bennett Glass would be the closing attorney. (Pls. Ex. 29, 48). However, Fifth Third permitted Burton Creek's Managing Member and one of the borrowers, Jake Helder,[3] to actually serve as the closing attorney. (Trs. p. 623-624, 644-666). Mr. Helder was responsible for the tasks of a closing attorney including disbursing

---

[3] Jake Helder is a licensed attorney in North Carolina.

loan funds and "document preparation, document signing, [and] and document recording." (Trs. p. 648; Pls Ex. 32, 37). In fact, Mr. Helder's office drafted the "closing opinion letter" and had it typed on Mr. Glass' stationary. (Trs. p. 651-652; Pls Ex. 48). Despite representing to First South that Mr. Glass was the closing attorney, Fifth Third obviously knew that Mr. Helder's firm was actually closing the loan because Fifth Third directly wired the loan proceeds to Mr. Helder's office, not to Mr. Glass. (Trs. p. 656-658, 1088-1089). Mr. Helder also received a "kickback" of the legal fees described in the HUD-1 statement as having been paid to Mr. Glass for his legal services. (Trs. p. 663-664; Pls Ex. 37, 44). The gross irregularities surrounding how Fifth Third allowed this large commercial loan to be closed was never disclosed to First South. The only party would was deceived or misled by the sham closing was First South.

## SUMMARY OF ARGUMENT

The District Court erred in entering judgment against First South on the NCUDTPA cause of action. The first error concerning this cause of action was the District Court's application of South Carolina law. North Carolina law should have been applied to the NCUDTPA claim. The Agreement stated that North Carolina law would apply. Additionally, the doctrine of *lex loci delicti* required the application of North Carolina law to the NCUDTPA cause of action. Further,

14

Fifth Third waived any right to assert the application of South Carolina law, as the parties and the Court applied North Carolina to all other causes of action.

The District Court further erred in finding First South failed to meet its burden of proof with respect to the NCUDTPA cause of action because the jury found Fifth Third committed fraud. Under North Carolina law, a finding of fraud establishes that unfair or deceptive acts have occurred in violation of N.C.G.S. §75-1.1 as matter of law.

The District Court also erred in finding First South elected a rescissionary remedy that precluded it from recovery under the NCUDTPA. First South did not elect a rescissionary remedy, but rather stipulated to a measure of monetary damages to make it whole, representing funds advanced towards the Loan's principal, the *pro rata* interest due from the borrowers on the Note, and the pro rata property taxes and appraisal fees. The stipulation of damages did not preclude a finding in favor of First South on the NCUDTPA cause of action.

Alternatively, assuming, *arguendo*, that South Carolina law applies to the unfair trade practices cause of action, the District Court erred in finding First South did not prove Fifth Third violated the SCUTPA. The evidence presented at trial establishes Fifth Third engaged in an unfair or deceptive act in the conduct of commerce, the unfair or deceptive act affected the public interest, and First South suffered monetary or property loss.

The District Court also erred in not awarding prejudgment interest to First South based on a stipulation as to the amount of interest. The stipulation regarding interest to which the District Court referred had nothing to do with prejudgment interest, but rather referred to the interest owed by the borrowers under the Note. Prejudgment interest on a verdict is mandatory under N.C.G.S. § 24-5. Accordingly, the District Court erred in not awarding First South prejudgment interest on the breach of contract and fraud causes of action.

## ARGUMENT

### I. THE DISTRICT COURT ERRED IN ENTERING JUDGMENT AGAINST FIRST SOUTH ON THE NCUDTPA CAUSE OF ACTION.

The determination of a NCUDTPA violation is a decision for the court under North Carolina law. *Walker v. Fleetwood Homes of N. Carolina, Inc.*, 653 S.E.2d 393, 399 (N.C. 2007). Because the District Court, rather than the jury, decided the cause of action for violation of the NCUDTPA, the Court of Appeals reviews the District Court's findings of fact for clear error and its conclusions of law *de novo*. *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 914 (4th Cir. 2003).

#### A. North Carolina Law Applies to the NCUDTPA Cause of Action.

The District Court erred in holding South Carolina law applied to the NCUDTPA cause of action. North Carolina law governs a NCUDTPA claim, as this is a North Carolina statutory claim. Fifth Third waived any right it had to rely

on South Carolina law, and both the Agreement and South Carolina choice of law require the application of North Carolina law. If North Carolina law is proper to apply to every other cause of action, it should also be proper for claims based on unfair trade practices.  It is erroneous to apply South Carolina law to only one cause of action. Accordingly, the District Court erred in applying South Carolina law to the NCUDTPA cause of action.

### 1. *The Substantive Law of North Carolina was Applied Throughout the Litigation.*

Throughout the litigation and at trial, Fifth Third made no suggestion that South Carolina law would apply. Rather, Fifth Third repeatedly argued, requested and implicitly consented to the application of North Carolina substantive law to all causes of action, both in contract and in tort. *See, e.g.,* (Dkt. 41, Rule 26(f) Report, p. 12 ("*Defendants' position [is] that this action, including all claims and causes of action asserted by Plaintiff, is governed under North Carolina law.*")); (Dkt. 41, Rule 26(f) Report, p. 13 (arguing North Carolina case law with respect to gross negligence cause of action); (Dkt. 149-1, Fifth Third's Mem. in Support of Summ. J., p. 26-35 (arguing North Carolina case law with respect to fraud, gross negligence, and misrepresentation causes of action)); (Dkt. 189, Fifth Third's Mem. in Opposition to Mot. to Amend Compl. (relying on North Carolina law)); (Dkt. 263-3, Feb. 21, 2012 Mot. Hearing Tr., 19:15-16 (Mr. Statman: "This is a North Carolina transaction, Your Honor.")). Indeed, during the trial, when

opposing the NCUDTPA cause of action, counsel for Fifth Third specifically relied on North Carolina law. (Trs. p 1246:10-1248:24 (citing *Winant v. Bostic*, 5 F.3d 767 (4th Cir. 1993) (decided under North Carolina law)); (Trs. p. 45 (In arguing to exclude an expert witness, Fifth Third's counsel said the expert "wasn't even aware that North Carolina law applied in our case, had not looked into North Carolina law."); (Trs. p. 1260-1262, 1659) (arguing N.C. law applied to unfair and deceptive trade practice claim.).

The parties, including Fifth Third, submitted proposed jury charges for claims of contract, tort, and damages that were *based entirely on North Carolina substantive law*. (Dkt. 263-4, Fifth Third's Proposed Tort Jury Charges; 263-5, Fifth Third's Objections to Plaintiff's Proposed Jury Charges; Trs. 1513). The Court instructed the jury using North Carolina substantive law for causes of action, in tort and contract. In the charge conference, the parties and the court discussed the fact that North Carolina law would apply. (Trs. 1659-1660).

It was not until Fifth Third submitted a proposed order to the District Court *after the trial* that it first argued for South Carolina law. *See* (Dkt. 263-1, Fifth Third's Proposed Order). While the District Court properly applied North Carolina to the other contract and tort claims, it was legal error to single out the unfair trade practices claim to apply South Carolina law as requested by Fifth Third after trial.

The same choice of law determination applies equally to the NCUDTPA as the other causes of action.

Thus, from the date of Rule 26 Initial Disclosures until after the jury rendered its verdict, North Carolina law was exclusively applied. In the charge conference, the court and the parties operated with the understanding that North Carolina law applied. (Trs. p. 1659-1660). Following that conference, the Court requested the citation to a case that interpreted the "North Carolina Unfair Trade Practices" and asked the parties to address that case interpreting North Carolina law. (Trs. p. 1659-1660, 1666). At no time did a choice of law question arise. It was prejudicially erroneous for the District Court to apply South Carolina substantive law to only one cause of action when North Carolina law was uniformly applied throughout the litigation.

The failure of Fifth Third to object at any time before, during, or at the trial, waived any right to assert the application of South Carolina law. *Bilancia v. Gen. Motors Corp.*, 538 F.2d 621, 623 (4th Cir. 1976) (finding the failure of a party to object at any time during trial or to except to a charge under Virginia law waived any right on their part to complain that the action was controlled by New Jersey law). In short, Fifth Third should "be precluded as a matter of law from adopting a legal position in conflict with [the] one taken in … [this] litigation." *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982).

19

In analogous cases, the courts have steadfastly applied the state law that was stipulated to, consented to, or implicitly relied upon by conduct of the parties. *See, e.g.*, *Mellon Investor Servs., LLC v. Longwood Country Garden Ctrs., Inc.*, 263 Fed. Appx. 277, 281 n.5 (4th Cir. 2008) ("Parties can within broad limits stipulate the substantive law to be applied to their dispute, and that is what we deem them to have done here by not objecting to the district judge's application of the substantive law of Illinois to their dispute."); *Provident Fin., Inc. v. Strategic Energy L.L.C.*, 404 Fed. Appx. 835 (5th Cir. 2010) (affirming that choice of law questions can be stipulated and waived by the parties during the course of litigation); *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 51 (2nd Cir. 1984) ("[I]n the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied")).

Thus, based on the doctrines of consent, waiver, and the conduct of the parties, the District Court should have applied North Carolina law to the unfair trade practices analysis as it did to every other cause of action.

### 2. *The Agreement Required the Application of North Carolina Law.*

The choice of law provision in the Agreement states it "shall be construed under the laws of the State of North Carolina." (Pls. Ex. 2, p. 5). The Fourth Circuit has held that contract-related tort claims, in addition to contract claims, are subject to a valid choice of law provision. *See Hitachi Credit Am. Corp. v. Signet*

*Bank,* 166 F.3d 614, 628 (4th Cir. 1999) (The Fourth Circuit has "honored the intent of the parties to choose applicable law" where the given provision in the contract is "sufficiently broad to encompass contract-related tort claims.")   A NCUDTPA action "is neither wholly tortious nor wholly contractual in nature." *Bernard v. Central Carolina Truck Sales, Inc.*, 314 S.E.2d 582, 584 (N.C. Ct App. 1984).

Here, the unfair and deceptive trade practices of Fifth Third arose from the inducement and breach of the Agreement.   The NCUDTPA cause of action is closely related to the Agreement, and necessarily requires the construction and interpretation of the Agreement such that the Agreement's choice of law clause applies to the interpretation of the NCUDTPA claim.   As discussed *supra*, Fifth Third expressly argued and represented that the Agreement's choice of law clause was broad enough to encompass contract-related tort claims. (Dkt. 41, Rule 26(f) Report, p. 13 (arguing North Carolina case law with respect to gross negligence cause of action); (Dkt. 149-1, Fifth Third's Mem. in Support of Summ. J., p. 26-35 (arguing North Carolina case law with respect to fraud, gross negligence, and misrepresentation causes of action)).   For these reasons, the choice of law provision in the Agreement compels the application of North Carolina law.   The District Court erred in failing to apply North Carolina law.

### 3. *Lex Loci Delicti Required the Application of North Carolina Law.*

South Carolina follows the traditional doctrine for tort actions referred to as *lex loci delicti*. "The general rule is that where an action is brought in one jurisdiction for a tort committed in another, all matters relating to the right of action are governed by the *lex loci delicti*. *Oshiek v. Oshiek*, 136 S.E.2d 303, 305 (S.C. 1964). "Under South Carolina law, a cause of action arises where the injury or wrongdoing occurs." *Mizell v. Eli Lilly & Co.*, 526 F. Supp. 589, 592 fn. 2 (D.S.C. 1981).

Under the *lex loci delicti* rule, "the place of the wrong is the locale in which the last act by a defendant occurs which makes him liable in tort." *Jordan v. Shaw Indus., Inc.*, Nos. 96-2189, et. al., 1997 WL 734029, at * 3 (4th Cir. Nov. 26, 1997) (citing *Brendle v. General Tire and Rubber Co.*, 408 F.2d 116, 117, n. 3 (4th Cir. 1969) ("The traditional *lex loci* rule is that tort actions are governed by the law of the place of the wrong, which is 'the [S]tate where the *last event necessary* to make an actor liable for an alleged tort takes place'")). The law is clear in both North Carolina and South Carolina that "a contract is formed where the final act of acceptance takes place." *Goldman v. Parkland of Dallas, Inc.*, 176 S.E.2d 784, 787 (N.C. 1970); *Noland Co. v. Graver Tank & Mfg. Co.*, 301 F.2d 43, 47, n.4 (4th Cir. 1962) ("[In South Carolina] it is well established that the governing law is that of the state where the last act leading to a binding contract occurs.").

This Court has also examined the "most significant relationship" for determining choice of law. *See In re Merrit Dredging Co., Inc.*, 839 F.2d 203, 206 (4th Cir. 1988) (determining whether a transaction has the appropriate relationship to South Carolina). Under this test, the factors to examine are: "(1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered." Restatement (Second) of Conflict of Laws § 145 (1971).

Here, the most substantial and final events that gave rise to the tort claims necessarily occurred in North Carolina. Without any doubt, the financial loss that First South suffered was in North Carolina. This action involved a North Carolina transaction to finance and develop a subdivision in North Carolina. The place where the wrong occurred was in North Carolina. The closing documents containing the false representations were generated and executed in North Carolina. (Pls. 1, 2, 3, 8, 24, 29, 32, 43. 48; Dkt. 264-1, Aff. of Callison). The falsified notarization and the forgery of the Tyson Guaranty occurred in North Carolina. (Trs. p. 603, 607; Pls. Ex. 46).

The entry and acceptance of the Agreement – the last act necessary to make Fifth Third liable for First South's contract, fraud, and NCUDTPA claims – occurred in North Carolina. The evidence is undisputed that Mr. Callison signed

the Participation Agreement first, and sent it to Mr. McAvoy in North Carolina, for execution in North Carolina. (Trs. p. 189-190, 198; Def. Ex. 17; Dkt. 264-1, Callison Aff.). First South physically received loan documentation from Fifth Third in North Carolina. (Trs. p. 386-87, 556, 1013). First South paid money to Fifth Third in North Carolina, which was wrongfully obtained and appropriated in North Carolina. (Def. Ex. 19, 22, 27, 28). The Burton Creek loan failed and went into default in North Carolina, resulting in litigation against the borrowers and guarantors in North Carolina. (Pls. Ex. 17).

In addition to the last act and injury occurring in North Carolina, the totality of the evidence demonstrates North Carolina bears the most significant relationship. Fifth Third admitted that North Carolina was the place where the wrong occurred and which has the most significant relationship to this dispute.  In a submission to the District Court, Fifth Third affirmed:

> *The Loan originated from Defendant's office in North Carolina, and it was managed entirely from Defendant's offices in North Carolina. All of the acts or omissions that Plaintiff alleges constitute breach of contract, mismanagement or fraud in the closing of the Loan, the administration and servicing of the Loan, and all of the alleged Events of Default under the Loan Documents that Plaintiff cites in its Complaint (Complaint ¶ 19) occurred in North Carolina and involved Defendant's employees and third parties in North Carolina.*

(Dkt. 18, p. 11) (emphasis added).  Since choice of law was never disputed during

trial, First South was proper in submitting evidence regarding choice of law after the District Court made the unexpected ruling on post-trial motions to deny the NCUDTPA claim by suddenly applying South Carolina law. While the totality of the evidence before the District Court supported the application of North Carolina law, the affidavit of Frank Callison presented additional facts as to the choice of law analysis that should have been considered. (Dkt. 264-1, Callison Aff.). Because choice of law was never an issue a trial, Mr. Callison's affidavit was proper to address the District Court's unexpected decision to apply South Carolina law. *See* Fed. R. Civ. P. 43(e)*; Spivey v. United States*, 912 F.2d 80 (4th Cir. N.C. 1990).

Accordingly, the District Court committed prejudicial factual and legal error in finding that South Carolina law applied based on traditional choice of law principles.

**B. Fifth Third Violated the NCUDTPA.**

Under North Carolina law, the determination of whether the NCUDTPA has been violated is a question of law for the Court. *Gray v. N.C. Ins. Underwriting Ass'n*, 510 S.E.2d 396, 401 (N.C. Ct. App. 1999). "In unfair trade practices cases, the jury need only find whether the defendant committed the acts alleged; it is then for the court to determine as a matter of law whether these acts constitute unfair or

deceptive practices in or affecting commerce." *Lee v. Keck*, 315 S.E.2d 323, 330 (N.C. Ct. App. 1984).

A party asserting a NCUDTPA claim must prove three elements: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, (3) which proximately caused actual injury to the claimant or his business. *Spartan Leasing, Inc. v. Pollard*, 400 S.E.2d 476, 482 (N.C. Ct. App. 1991). District Court concluded First South failed to prove the first and third elements. *See* (Dkt. 242, ¶¶ 6-9). The District Court did not conclude First South failed to prove the second element. Regardless, Fifth Third's acts affected commerce. N.C. Gen. Stat. § 75-1.1(b) ("'Commerce' includes all business activities, however denominated…"); *see also, e.g., Bhatti v. Buckland*, 400 S.E.2d 440 (N.C. 1991) (finding a commercial land transaction affected commerce in a broad sense). The District Court wrongfully found that First South failed to prove a violation of NCUDTPA.

### 1. *The Jury's Finding of Fraud Established a NCUDTPA Violation as a Matter of Law.*

The District Court should have concluded the NCUDTPA was violated as a matter of law because the jury expressly found fraud. A finding of fraud equals a NCUDTPA violation. To hold otherwise, is a clear legal error.

During the trial, First South's counsel explained "the law says that if a fraud is found as a matter of law, that is an unfair trade practice." (Trial Trs. p. 1660). In

response, the District Court agreed "that's the way I understood it." (Id.). This Order, however, does not reflect this correct understanding of the law.

A finding of fraud is an automatic finding of liability under NCUDTPA. "***A plaintiff who proves fraud thereby establishes that unfair or deceptive acts have occurred in violation of G.S. 75-1.1***." *Davis v. Sellers*, 443 S.E.2d 879, 884 (N.C. 1994) (emphasis added). "It is axiomatic that proof of fraud necessarily constitutes a violation of the prohibition against unfair and deceptive trade practices." *Pearce v. Am. Defender Life Ins. Co.*, 343 S.E.2d 174, 180 (N.C. 1986); *see also Media Network, Inc. v. Long Haymes Carr, Inc.*, 678 S.E.2d 671, 684 (N.C. Ct. App. 2009). "Proof of fraud in the inducement necessarily constitutes a violation of Chapter 75 [the NCUDTPA] and shifts the burden of proof from the plaintiff to the defendant, which must then prove that it is exempt from Chapter 75's provisions." *Bhatti v. Buckland,* 400 S.E.2d 440, 442 (N.C. 1991). "Fraud, if proved, necessarily constituted a violation of the prohibition against unfair or deceptive practices. Plaintiff here obtained a jury finding of fraud. The trial court, therefore, had no choice but to treble plaintiff's damages." *Kim v. Prof'l Bus. Brokers, Ltd.*, 328 S.E.2d 296, 300 (N.C. Ct. App. 1985).

The jury found that Fifth Third committed fraud. (Trs. p. 1661-1662; Dkt. 240, Verdict Form). The jury instruction on fraud was based on North Carolina law without exception. (Trs. 1638-1643). Therefore, the District Court was required to

find Fifth Third violated the NCUDTPA. *See Jones v. Harrelson & Smith Contractors, LLC*, 670 S.E.2d 242 (2008), *aff'd per curiam*, 677 S.E.2d 453 (2009) (jury verdict for plaintiff on the fraud claim establishes an automatic finding for unfair and deceptive trade practices and treble damages); *Bhatti v. Buckland*, 400 S.E.2d 440 (N.C. 1991) (holding that because the jury found the sale was produced by fraud, the defendant's acts were unfair and deceptive as a matter of law); *Douglas v. Doub*, 383 S.E.2d 423, 428 (N.C. Ct. App. 1989) ("The jury's determination that defendant husband committed a fraudulent act in inducing the plaintiff to purchase the condominium was sufficient to support the trial court's finding and subsequent conclusion that the defendants engaged in unfair and deceptive trade practices in violation of N.C.G.S. Sec. 75-1.1."); *Edwards v. West*, 495 S.E.2d 920 (N.C. Ct. App. 1998) (affirming the trial court's post trial order finding that the NCUDTPA was violated based on the jury's finding of fraud); *Compton v. Kirby*, 577 S.E.2d 905, 917 (N.C. Ct. App. 2003) (holding that the jury finding constructive fraud requires the court to enter as a matter of law that the NCUDTPA was violated); *Davis v. Sellers*, 443 S.E.2d 879, 884 (N.C. Ct. App. 1994) ("Since the jury found in favor of plaintiff on her fraud claim, plaintiff is entitled to treble damages [under the NCUDTPA]."). Thus, contrary to the District Court's ruling, given the finding of the jury on the fraud cause of action, no special interrogatories or further factual inquiry was required. *See* (Dkt. 242, ¶¶ 6, 8).

The District Court was required by law to find the NCUDTPA was violated based on the clear finding of fraud.  Thus, the District Court erred.

### 2. The Evidence Presented at Trial Demonstrated Fifth Third's Unfair and Deceptive Actions Proximately Caused Injury to First South.

The "causal relation between the violation of the statute [NCUDTPA] and the injury complained of is an issue of fact for a jury." *Ellis v. Smith-Broadhurst, Inc.*, 268 S.E.2d 271, 274 (N.C. Ct. App. 1980).  To establish fraud, the District Court instructed the jury that it must find that the false representation or concealment of fact "result[s] in damage to the injured party." (Trial Trs. p. 1639). The District Court instructed the jury on proximate cause on several occasions, as follows:

> Proximate cause is an element that must be established by a preponderance of the evidence as to each of Plaintiff's causes of action.
>
> …..
>
> For each of the Plaintiff's causes of action you must determine whether the conduct of the Defendant complained of is a proximate cause of the damages the Plaintiff seeks… The plaintiff must prove, by the greater weight of the evidence, that the defendant's actionable conduct was a proximate cause of the damages it seeks…. If … you find that the Plaintiff has established the essential elements of one or more of its causes of action by a preponderance of the evidence, your verdict should be for the Plaintiff and you should next consider the question of remedies and damages.

(Trs. p. 1632, 1645-1647). Thus, in finding fraud, the jury necessarily concluded Fifth Third's fraudulent conduct was the proximate cause of First South's injury. Accordingly, the District Court erred in concluding First South failed to establish proximate cause.

### 3. First South Did Not Stipulate to Damages In a Manner that Precludes a Finding of Liability Under the NCUDTPA.

The District Court erred in finding that First South "waived actual damages and instead sought rescission damages." (Dkt. 242, ¶ 8). First South stipulated only to its measure of actual damages properly sought for breach of contract and fraud in the inducement. First South stated:

> The **damages** we seek are essentially our money back and to restore us in the position we were prior to signing the contract. We're not seeking actual damages *that are above* rescission or our money back. **The proper measure of damages encompasses damages to restore First South Bank in a condition in its original place as if the misrepresentations and the fraud and the material breach had not occurred and that the agreement had not been reached.**

(Trs. p. 67-68; 1271-72). This stipulation of damages is exactly the type of actual damages that the law in North Carolina allows for fraud in the inducement – a recovery that "restore[s] the plaintiff to its original position, [that] give[s] back to him that which was lost as far as it may be done by compensation in money." *Tradewinds Airlines, Inc. v. C-S Aviation Servs.*, 733 S.E.2d 162, 169 (N.C. Ct. App. 2012). "It is elementary that a plaintiff in a fraud suit has a right to recover an

amount in damages 'which will put him in the same position as if the fraud had not been practiced on him.'" *Godfrey v. Res-Care, Inc.*, 598 S.E.2d 396, 404 (N.C. Ct. App. 2004). It is axiomatic that 'actual damages' and 'compensatory damages' mean the same thing at law. *Bryant v. Reedy*, 200 S.E. 896, 900 (N.C. 1938); *Vaught v. A.O. Hardee & Sons, Inc.*, 623 S.E.2d 373, 375 (S.C. 2005) ("Actual damages are properly called compensatory damages, meaning to compensate, to make the injured party whole, to put him in the same position he was in prior to the damages received insofar as this is monetarily possible.") *Black's Law Dictionary* 394 (7th ed. 1999) (actual damages mean to compensate for a proven loss). Similarly, "'actual damages' or 'compensatory damages' are damages in satisfaction of, or in recompense for, loss or injury sustained." *Laird v. Nationwide Ins.*, 134 S.E.2d 206 (S.C. 1964)).

For a claim of fraud in the inducement, a plaintiff is entitled to a recovery that will "restore the plaintiff to its original position, to give back to him that which was lost as far as it may be done by compensation in money" and the purpose of this claim is to "make the plaintiff whole and to prevent the defendant from profiting from its fraudulent conduct." *Tradewinds Airlines, Inc.*, 733 S.E.2d at 169 (N.C. Ct. App. 2012). There is no precedent in North Carolina providing that recovery for fraud in the inducement is not actual damages. North Carolina law does not hold that these damages are legally incompatible with "actual damages"

or that recovery under NCUDTPA is foreclosed. Rather, North Carolina law allows recovery under NCUDTPA based on a finding of fraud in the inducement. *See Douglas v. Doub*, 383 S.E.2d 423, 428 (N.C. Ct. App. 1989).

As First South's counsel stated on the record, First South was not seeking damages *in excess* of restoring the plaintiff as if the Agreement was never entered. (Trs. 67-68; 1260-1261; 1271-1272; 1495). This is exact measure of actual damages allowable for fraud in the inducement which is to "restore the plaintiff to its original position" and "to give back to him that which was lost." *See e.g. Tradewinds Airlines, supra.* Thus, First South did not waive actual damages; it clarified the measure of money damages based on North Carolina law regarding fraud in the inducement.

During the trial, First South offered evidence of the money damages sought to recover. (Trs. p. 1144-1145). First South's measure of damages in this case was the (1) amounts that First South paid to Fifth Third minus the amounts that Fifth Third credited back to First South from litigation with the borrowers, (2) First South's percentage of the interest payments that the borrowers owed under the loan; and (3) First South's payments for appraisal fees and property tax payments. (Trs. p. 1144-1145). Fifth Third stipulated to these amounts. (Trs. p. 1123, 1274-1275 (The Court: "we've stipulated to what the *damages* are.")). The damages presented to the jury were as follows:

| | |
|---|---|
| Amount Paid with Credits from Borrower: | $2,515,765.24 |
| Interest due from Borrowers: | $231,467.22 |
| Payment of Property Taxes and Appraisal Fee: | $17,000.00 |

(Trs. p. 54, 1144-1145, 1148-1157, 1174, 1176, 1252-1253, 1431).

First South explained "we're not seeking any actual damages over and above

the numbers we put here [on the board to the jury], which is our money back….

[but we are seeking] actual damage in the sense of actual damages."   (Trs. p.

1272).  First South further expounded:

> I want to clear something up about damages. We haven't
> waived our right to damages. What we did say, Your
> Honor, is that we're not seeking damages in excess of
> getting our money back, which means if you look at
> some of the jury charges previously submitted, we have
> lost profits in some of the jury charges, consequential
> damages. We're not seeking anything other than our
> money back to restore -- and this is what the claim for
> negligent misrepresentation, fraud in the inducement, and
> gross negligence, to restore the plaintiff in his original
> position, to give him his money back, as far as possible to
> restore him in the condition he was before the wrongful
> conduct. To make the plaintiff whole, to restore the
> plaintiff to his original condition, to put him in the same
> position as if the wrong had not been practiced, and in
> this case, as if the contract had not been agreed upon.
> That is the damages we're seeking.

(Trs. p. 1260-1261).

Even the District Court recognized that First South's intent was to stipulate

to the measure of its actual damages. In further arguing this point, First South's

counsel stated "rescissionary damages are compensatory damages" and that

rescissionary damages and actual damages are not mutually exclusive, but rather, can be the same method of measuring damages. (Trs. p. 1495). The following exchange then occurred:

> THE COURT: I would agree with that. My question really and my concern is not how you characterize them or anything like that. It's more about whether the particular cause of action, the measure of damages for that cause of action is the kind of damages you're seeking which I think is to get your money back.
>
> MR. COLLINS: Yes, ma'am. We have only presented one type of damage.
>
> THE COURT: Right.
> ….
> MR. STATMAN: They can research until the cows come home later tonight. They withdrew their actual damage claim. That was their conscious choice….
>
> THE COURT: Well, I don't know about that. I think they tried the case exactly the way they intended to try it, which was to recover the money that they paid to fund this loan. And the question is whether or not that measure is available under each of these causes of action. And that's my only concern. I just don't think they are for all of them. I know it is for some.

(Trial Tr. 1495:11-1496:20). The District Court's statements during trial demonstrate the court understood First South was only clarifying its position on the measure of damages available under the causes of action presented to the jury. The District Court governed the trial as if damages were to be determined. The jury

instructions included the word "damages" 37 times, including Fifth Third's request to instructed the jury on "mitigation of damages." (Trs. p. 1624-1651).

The jury obviously believed it was awarding damages because the jury submitted a question during deliberations that read "If the jury finds for the plaintiff, is the damages dollar amount set, parens, $2,764,232.42, or does the jury determine the amount of damages?" (Trs. p. 1655-1658). After Fifth Third argued to reinstruct the jury on mitigation of damages, the court answered the jury's question as follows "The jury is to determine the amount of damages based upon the instructions of law that I gave you." (*Id.*). The verdict form and the judgment form contemplated that actual damages were determined. (Dkt. 240 ("We, the undersigned jurors, ***assess the damages*** in favor of Plaintiff First South in the amount of $2,368,232.40.")); (Dkt. 243 (The Judgment provides "Two million, three hundred sixty-eight thousand, two hundred thirty-two dollars and 46/100 cents ($2,368,232.46) dollars in ***actual damages***.")). Following the trial, however, the District Court took a completely inconsistent position in denying recovery under NCUDTPA.

Most importantly, there is no legal authority to support the conclusion that NCUDTPA does not apply to "rescission damages" or to the damages presented in this case. The NCUDTPA makes no distinction between "actual damages" or "recessionary damages." The NCUDTPA requires that a party suffer only an

35

"actual injury." *Canady v. Mann*, 419 S.E.2d 597, 602 (N.C. 1992).  The case of *Bernard v. Central Carolina Truck Sales, Inc.*, 314 S.E.2d 582 (N.C. Ct. App. 1984), is instructive. In *Bernard*, the court recognized that "the statute merely refers to the person being 'injured' and does not state the method of measuring damages." *Id.* at 585. The court reasoned "we do not believe, however, that the only available measure of damages is that for fraudulent inducement" and that it would be "illogical" to limit the "methods of measuring damage." *Id.* The North Carolina Court took a broad and expansive view of "actual injury." "To rule otherwise would produce the anomalous result of recognizing that although G.S. 75-1.1 creates a cause of action broader than traditional common law actions, G.S. 75-16 limits the availability of any remedy to cases where some recovery at common law would probably also lie." *Id*. The *Bernard* court then concluded "the measure of damages used should further the purpose of awarding damages, which is 'to restore the victim to his original condition, to give back to him that which was lost as far as it may be done by compensation in money.'" *Id*. This was exactly how First South measured its damages. (Trs. p. 67-68, 1271-1272).  Regardless of the nomenclature use to describe damages, First South clearly suffered an "injury" that resulted in financial harm. Thus, the distinction over actual damages versus recessionary relief is of no consequence and without effect.

Further, even assuming *arguendo*, that First South stipulated to a rescission remedy, the District Court's finding that "*Winant v. Bostic*, 5 F.3d 767 (4th Cir. 1993), forecloses First South's ultimate end-goal with respect to the NCUDTPA claim" is incorrect. (Dkt. 292, p. 16). The *Winant* decision only dealt with treble damages. A finding of a NCUDTPA violation *allows the recovery of attorney's fees independent of treble damages*. *See N*.C. Gen. Stat. § 75-16.1. In this case, the District Court did not appreciate that attorney's fees are recoverable even if treble damages are not permitted. (2/24/14 Hr. Trs. p. 86-96). Thus, regardless of the holding in *Winant* about treble damages, First South is entitled to attorney's fees.

Furthermore, *Winant* is not dispositive because the plaintiff in that case elected to rescind the transaction. First South did not rescind a transaction but sought money damages, and as *Winant* observed "damages for fraud in the inducement of a contract may be elected as a remedy, in which case the amount may be trebled under N.C. Gen. State Sec. 75.16." *Winant*, 5 F.3d at 777. Thus, the holding of *Winant v. Bostic*, 5 F.3d 767 (4th Cir. 1993) does not foreclose First South relief under NCUDTPA.

Accordingly, the District Court erred in finding that First South waived its claim for actual damages and that the holding of *Winant* prohibits First South's claim under the NCUDTPA.

## C. The Evidence Established Fifth Third Violated the SCUTPA.

Even assuming, *arguendo*, that South Carolina law should apply to First South's unfair trade practices claim, the evidence at trial established that Fifth Third also violated the South Carolina Unfair Trade Practices Act (SCUTPA).

To recover under SCUTPA, a plaintiff must establish: (1) the defendant engaged in an unfair or deceptive act in the conduct of trade or commerce; (2) the unfair or deceptive act affected the public interest; and (3) the plaintiff suffered monetary or property loss as a result of the defendant's unfair or deceptive acts. *Wright v. Craft*, 640 S.E.2d 486, 498 (S.C. Ct. App. 2006). S.C. Code § 39-5-140(a) creates a private right of action in favor of "[a]ny person who suffers any *ascertainable loss of money or property*, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by § 39-5-20…." (emphasis added). Under this statute, a plaintiff can recover treble damages where "the use or employment of the unfair or deceptive… act or practice was a willful or knowing violation of § 39-5-20."[4] *Noack Enters., Inc. v. Country Corner Interiors of Hilton Head Island, Inc.*, 351 S.E.2d 347, 348-49 (S.C. Ct. App. 1986). The purpose of this statute is not to provide a "windfall" recovery, but to punish and deter wrongdoing in the

---

[4] The wrongful conduct was found to be "willful" and "knowing" based on the jury's finding of both fraud and punitive damages. "Willful" and "knowing" are threshold requirements to find fraud and award punitive damages. (Trs. p. 1638-1639, 1647-1650).

38

marketplace. *City of Charleston, S.C. v. Hotels.com, LP*, 520 F.Supp.2d 757, 776 (D.S.C. 2007) (reasoning that the SCUTPA is "intended to punish and deter" behavior).

The preponderance of the evidence standard applies to proving the elements of a claim for violation of the SCUTPA. Furthermore, "[SCUTPA] should not be construed to increase a plaintiff's burden of proving liability since its purpose is to give additional protection to victims of unfair trade practices, not to make a case harder to prove than it would be under common law principles." *deBondt v. Carlton Motorcars, Inc.*, 536 S.E.2d 399, 407 (S.C. Ct. App. 2000).

Consequently, the District Court erred it finding that "had First South asserted a claim under the SCUTPA, the claim would fail." (ECF 242, ¶ 5).

### 1. The Evidence Established Fifth Third Engaged in Unfair or Deceptive Acts in the Conduct of Trade or Commerce.

"A deceptive practice is one which has a tendency to deceive." *deBondt v. Carlton Motorcars, Inc.*, 536 S.E.2d 399, 407 (S.C. Ct. App. 2000). "Under South Carolina law, a trade practice is 'unfair' when it is 'offensive to public policy or when it is immoral, unethical, or oppressive.' " *Beattie v. Nations Credit Fin. Servs. Corp.*, 69 F. App'x 585, 588 (4th Cir. 2003). Fraud is a trade practice that is inherently deceptive, offensive to public policy. At the very least, fraud is immoral, unethical, and oppressive. The SCUTPA broadly defines trade and

commerce as to including "any trade or commerce directly or indirectly affecting the people of this State."  S.C. Code Ann. § 39-5-10(b) (1978).

The jury's finding that Fifth Third engaged in fraud in the transaction with First South clearly constitutes both a deceptive and unfair trade practice in the conduct of trade or commerce within the SCUTPA. The evidence at trial established that Fifth Third fraudulently induced First South to enter into the Agreement based on false and deceptive representations that Lincoln County had provided evidence of available sewer service for 204 lots. (*See* Statement of Facts (a) above p. 5).   The evidence also established that Fifth Third fraudulently represented to First South that Fifth Third had obtained a properly executed Tyson Guaranty.   (*See* Statement of Facts (b) above p. 10). But in actuality, the Fifth Third knew the Tyson Guaranty was not executed. The Tyson Guaranty was forged and the undisputed evidence was that a senior vice president of Fifth Third instructed a loan assistant to illegally falsify her notary. (*See* Statement of Facts (b) above p. 10; Trs. p. 605-606).  Not only are these acts deceptive, they are criminal. *See* N.C.G.S. §§ 10B-20, 10B-60.  Evidence proved that Fifth Third had a routine pattern and practice of having loan documents falsely notarized and disbursing loan funds without obtaining the required documents. (Trs. p. 603-609, 952-953). These misrepresentations and fraudulent conduct directly affected First South, a

South Carolina bank.  Therefore, Fifth Third's conduct unquestionably falls within the broad definition of trade and commerce under the SCUTPA.

### 2. *The Evidence Proved Fifth Third's Unfair and Deceptive Acts Affected the Public Interest.*

The District Court erred in finding that First South did not offer any evidence that Defendant's action were capable of repetition to have an impact on public interest. (Dkt. p. 242, p. 6-7). The District Court reasoned that First Charter Bank no longer exists due to a merger, and "there is no evidence to establish that any of the facts established at trial had occurred in the past or are continuing in the future." *Id.* This is a misstatement of the law and a misinterpretation of the evidence.

Due to the very nature of Fifth Third's business, there is a *potential* for repetition.  "Prior case law makes very clear that evidence of a potential for repetition, generally speaking, in and of itself establishes the required public impact." *Daisy Outdoor Adver. Co., Inc. v. Abbott*, 473 S.E.2d 47, 51 (S.C. 1996). "South Carolina law states that 'the public interest prong of the [SCUTPA] inquiry [is] satisfied by evidence of a *potential for repetition* of the unfair or deceptive act.'" *Id at 50.* "There are two general ways to demonstrate the potential for repetition: (1) by showing the same kind of actions occurred in the past, thus making it likely the actions will continue absent some deterrence, or (2) by showing the company's procedures create a potential for repetition of the unfair

and deceptive acts." *deBondt*, 536 S.E.2d at 407. "These are not the only means of showing the potential for repetition, however, and each case must be evaluated on its own merits." *Id*. The South Carolina Supreme Court reasoned that the potential for repetition is a lenient standard, especially when the business involves transactions. *York v. Conway Ford, Inc.*, 480 S.E.2d 726, 728 (S.C. 1997) (holding that since "[defendant] is in the business of selling cars" then "certainly the alleged acts or practices have the potential for repetition").

Deceptive and fraudulent acts connected with real property transactions impact commerce and necessarily affect the interest of the public. *See Bhatti v. Buckland*, 400 S.E.2d 440 (N.C. 1991) (finding a commercial land transaction affected commerce in a broad sense). Forging signatures and falsifying official notaries of bank documents is a breaches of public trust, and the public has an interest in ensuring that bank officers do not falsify legal and recorded documents.

The direct proof of repetition is undisputed. The evidence confirmed that Fifth Third's employees had a history of falsifying loan documents in the past as instructed by their loan officers, which is *direct proof of repetition*. (Trs. p. 603-609, 952-953). Ms. Cobb described the Tyson Guaranty as "just one of dozens, if not more" that she falsely notarized and "it was just common practice". (Trs. p. 605). She said that this practice "became commonplace, but I was never comfortable with it" which led her and other loan assistants to express concern to

their supervisors. (Trs. p. 605-607). The evidence at trial established the potential for repetition of Fifth Third unfair and deceptive actions based on the testimony that Fifth Third encouraged loan assistants to falsely notarize documents and the testimony that this was a routine loan agreement which the Defendant was in the business of making. (Trs. p. 603-609, 952-953). The testimony is unwavering that this conduct has happened many times in the past for routine transactions. (Trs. p. 602-609; 1288, 1305). Further, the issuance of sewer taps affects the public interest. Sewer service requires governmental approval with numerous public utility and environmental concerns. Fifth Third had a longstanding custom and practice of closing loans without securing conditions precedent as represented. (Trs. p. 952-953).

Given Fifth Third's business as a lender, this evidence alone is sufficient to establish that the defendant's fraudulent misconduct was not only capable of repetition but was possibility repeatedly in loan closings. *York v. Conway Ford, Inc.*, 480 S.E.2d 726, 728 (S.C. 1997) (determining potential for repetition based on type of business). In fact, the evidence proved that it was actually repeated. Therefore, the District Court erred in ruling that First South "did not offer any proof that [the defendant's acts]… had an impact on the public interest as that term is defined under the SCUTPA and applicable South Carolina law." (Dkt. 242 ¶ 5).

Moreover, the fact that Fifth Third acquired First Charter Bank through a merger does not change the analysis or alter this conclusion. To hold that the SCUTPA cannot be met because the First Charter Bank was involved in a merger is clearly erroneous and not supported by existing law.  This argument has never been recognized as a defense. Fifth Third has not disputed its liability for the misconduct of First Charter as the successor entity after the merger. Where a successor assumes liability for the actions of the predecessor, then the actions of the predecessor are imputed to the successor. *Richmond v. Madison Mgmt. Group, Inc.*, 918 F.2d 438, 454 (4th Cir. 1990). The merger cannot exonerate Fifth Third from the misconduct of First Charter and does not remedy the fact that the misconduct had an impact on the public interest. As a matter of necessity, the element of the impact on the public interest under the SCUTPA must be adjudicated based on the events at the time of the misconduct, not subsequent developments. Otherwise, a defendant could avoid liability for an unfair or deceptive trade practice by going out of business, changing its name or legal ownership, or through participating in an acquisition or merger.  This would contravene the letter and spirit of SCUTPA.

Accordingly, evidence in the record proved direct repetition, or the potential for repetition, that would affect the public interest as a matter of law.

### 3.  *First South Suffered an Ascertainable Loss.*

The District Court also erred in finding that First South did not establish any actual damages to permit finding that Fifth Third was liable under the SCUTPA. (Dkt. 242, ¶ 5).

"To bring an action under the Unfair Trade Practices Act, an individual must have suffered an '*ascertainable loss*.'" *Dowd v. Imperial Chrysler-Plymouth, Inc.*, 381 S.E.2d 212, 214 (S.C. Ct. App. 1989) (quoting S.C. Code Ann. § 39-5-140 and emphasis added). In fact, § 39-5-140 broadly provides a cause of action under the SCUTPA to "[a]ny person who suffers *any ascertainable loss* of money or property." The language of SCUTPA is not limited to a finding of actual damages. "'Recoverable damages include compensation for all injury to plaintiff's property or business which is the natural and probable consequence of defendant's wrong.'" *Collins Holding Corp. v. Defibaugh*, 646 S.E.2d 147 (S.C. Ct. App. 2007).

In South Carolina, the remedy of rescission of a contract clearly encompasses recovery of an ascertainable loss: "Rescission, as a remedy, returns the parties to the status quo ante. A return to the status quo ante necessarily requires any party *damaged* to be compensated." *Boddie-Noell Props. Inc. v. Magnolia P'Ship.*, 544 S.E.2d 279, 283-84 (S.C. Ct. App. 2000). Actual damages under the SCUTPA mean common law damages and include "the difference in value between that which the plaintiff parted and that which he received." *Payne v. Holiday Towers, Inc.*, 321 S.E.2d 179, 182 (S.C. Ct. App. 1984). As discussed

*supra*, First South recovered for the losses it sustained as a result of Fifth Third's breach of contract and fraud in the inducement in the amount of $2,764,232.46. (Trs. p. 67-68; 1271-1272).

Significantly, the purpose of the SCUTPA is not to compensate the plaintiff and recovery is not premised on actual damages. *See Hines v. IBG Intern., Inc.*, 813 F.2d 1331 (4th Cir. 1987) ("The purpose of the treble damages provision under the Unfair Trade Practices Act is not to compensate the plaintiff, but to punish the defendant and to provide inducement for the plaintiff to act as a private attorney general. Those considerations have little to do with application of a rule against duplicative recovery of compensatory damages").

### 4. *The District Court Erred in Denying First South the Right to Present a SCUTPA Claim to the Jury.*

The District Court's decision to apply South Carolina law resulted in an involuntary waiver of First South's right to a jury trial on its unfair trade practices claim. Under North Carolina law, the court only determines an unfair trade practice violation. *Walker v. Fleetwood Homes of N. Carolina, Inc.*, 653 S.E.2d 393, 399 (N.C. 2007). In South Carolina, this is a question for the jury. *Wright v. Craft*, 640 S.E.2d 486 (S.C. 2006).

The District Court never made any indication before or during trial that it believed South Carolina law would apply. First South proceeded with the clear understanding that the court would make the determination of an unfair trade

practice violation since North Carolina law requires this decision to be made by the judge, not the jury. If the District Court had properly informed the parties of its intention to apply South Carolina law, then First South could have presented this claim to the jury.

During trial, the District Court stated "I would also like to make the record clear that the parties have agreed to allow the Court, and not the jury, to decide the cause of action for unfair trade practices. And I will do that after the jury has reached its verdict on the remaining claims." (Trs. p 1503). This ruling was made relying on North Carolina law under the NCUDTPA that requires the court, not the jury, to determine if an unfair trade practice has been committed. *Walker v. Fleetwood Homes of N. Carolina, Inc.*, 653 S.E.2d 393, 399 (N.C. 2007). However, under South Carolina law, the jury determines whether the plaintiff has proven the defendant violated the SCUTPA. *Liberty Mut. Ins. Co. v. Employee Resource Mgmt., Inc.*, 176 F. Supp. 2d 510 (D.S.C. 2001).

Because the District Court made this decision after the trial, First South was substantially prejudiced because the District Court deprived First South of its constitutional right to a jury trial under SCUTPA. If the District Court believed South Carolina controlled, this should have been determined before it was determined to have this cause of action reserved for the judge under North Carolina law. The District Court's decision violates the long standing principle that courts

disfavor finding a party waives its right to a jury trial and "give every reasonable presumption against waiver, since the right to a jury trial is fundamental." *In re Charlotte Commercial Grp., Inc.*, 288 B.R. 715, 720 (Bankr. M.D.N.C. 2003). As such, this error deprived First South of its Seventh Amendment right to a jury trial if South Carolina law should have applied.

## II. THE DISTRICT COURT ERRED IN DENYING MANDATORY PREJUDGMENT INTEREST TO FIRST SOUTH.

A district court's denial of an award of prejudgment interest is reviewed for abuse of discretion. *G ex rel. RG v. Fort Bragg Dependent Schools*, 343 F.3d 295, 311 (4th Cir. 2003).

In the Complaint, First South prayed for pre-judgment interest. (Dkt. 72; Dkt. 212). Following the trial, First South timely moved for an award of prejudgment interest. (Dkt. 263, p. 1-36). The District Court declined to award First South prejudgment interest, reasoning that First South's stipulation at trial on damages constituted a waiver of any right it had to prejudgment interest.[5] (Dkt. 292, p. 17). This ruling, and its underlying reasoning, was error.

The District Court's decision is not based on established law. First South was entitled to prejudgment interest as a matter of law pursuant to N.C. Gen. Stat. § 24-5. "Prejudgment interest is a matter of state substantive law." *Sec. Ins. Co. v.*

---

[5] To the point that North Carolina law applied throughout this case, the District Court relied upon North Carolina law for prejudgment interest. (Dkt. 292, p. 17).

*Arcade Textiles, Inc.*, 40 Fed. Appx. 767 (4th Cir. 2002). North Carolina courts have held that pre-judgment interest is to be awarded by the court following entry of judgment. The statute, N.C.G.S. § 24-5, does not require the issue of pre-judgment interest to be submitted to the jury. *Dailey v. Integon General Ins. Corp.*, 331 S.E.2d 148, 159 (N.C. Ct. App. 1985); *Taha v. Thompson*, 463 S.E.2d 553, 557 (N.C. Ct. App. 1995).

A review of decisions of North Carolina state courts, the Fourth Circuit Court of Appeals, and the District Courts of North Carolina establishes that an award of prejudgment interest in North Carolina is ***mandatory*** and must be awarded as a matter of law. *See Metromont Materials Corp. v. R.B.R. & S.T.*, 463 S.E.2d 305, 307 (N.C. Ct. App. 1995) *rev. denied by* 467 S.E.2d 903 (N.C. 1996) ("interest is awarded as a matter of law."); *Hamby v. Williams*, 196 N.C. App. 733, 676 S.E.2d 478, 481 (N.C. Ct. App. 2009) ("We hold this provision to be mandatory and not discretionary on the part of the trial court, and that the trial court erred in not awarding prejudgment interest to plaintiff."); *Castles Auto & Truck Serv., Inc. v. Exxon Corp.*, 16 F. App'x 163, 168 (4th Cir. 2001) (concluding that N.C. Gen. Stat. § 24-5 is "unambiguously mandatory") (unpublished); *Monsanto Co. v. Are-108 Alexander Rd., LLC*, C/A 1:10CV898, 2013 U.S. Dist. LEXIS 40935, *15 fn. 5 (M.D.N.C. Mar. 25, 2013) ("an award of prejudgment interest is mandatory").

The "intent of the prejudgment interest statute… is threefold: (1) to compensate plaintiffs for loss of the use of their money, (2) to prevent unjust enrichment of the defendant by having money he should not have, and (3) to promote settlement." *Brown v. Flowe*, 507 S.E.2d 894 (N.C. 1998). North Carolina courts have held pre-judgment interest is to be awarded by the court following entry of judgment. The statute does not require the issue of pre-judgment interest to be submitted to the jury. *Taha v. Thompson*, 463 S.E.2d 553, 557 (N.C. Ct. App. 1995).

The loss of interest to be paid by the borrowers included in the damages stipulation did not include prejudgment interest. The measure of damages included interest payment that would have been owed *by the borrowers under the Note* as calculated by the "Wall Street Journal Prime Floating Rate." (Pls. Ex. 28, p.1; Pls. Ex. 1, p. 1; Trs. p. 56, 59, 589, 1152, 1156-1157). Fifth Third's cross-examination of Mr. Lyerly fully reveals that Fifth Third understood the interest included in the stipulation was what was required to be paid by the borrowers pursuant to the terms of the Note. (Trs. p. 1151-1154, 1156-1157, 1174, 1177). Mr. Lyerly was asked about the "36 percent of the interest payment", that First South "didn't get to collect globally on [its] share of …interest", and that this money would come from Tyson and other borrowers. (Trs. p. 1156-1157, 1177-1178).

In support of the motion for pre-judgment interest, Mr. Lyerly submitted an affidavit explaining the interest component of the damages calculation was what the borrowers should have paid under the Note, not pre-judgment based interest. (Dkt. 264-2). The loss of interest payments due from the borrowers under the Note has nothing to do with the pre-judgment interest that Fifth Third owed First South for the losses it proximately caused. Further, in reaching the stipulated amount of damages, First South never stated or implied that the stipulated damages would serve to abandon its claim for an award of prejudgment interest following a verdict. The recoverability of pre-judgment is a separate legal concept than damages to be recovered from the jury. First South does not receive a "windfall" as the District Court suggested because prejudgment interest is not damages. (Dkt. 292, p. 18). The District Court cannot deny First South its mandatory right to prejudgment interest just because it arbitrarily believed it would be "unfair."

North Carolina law directly supports the recovery of both interest damages and pre-judgment interest. In *Broussard v. Meineke Discount Muffler Shops*, 958 F. Supp. 1087, 1103 (W.D.N.C. 1997), the court held that a plaintiff may recover both interest damages *and* pre-judgment interest. In so reasoning, the court found that the pre-judgment interest statute does not preclude the recovery of interest damages. *Id.* The court held that prejudgment interest *and* "damages in the form of lost interest which are recoverable under the principles governing the recovery

of damages in general" are allowable. Just as in *Broussard*, First South is entitled to recover damages characterized as interest from what the borrower would have paid under the Note and pre-judgment interest on money Fifth Third owed as a matter of law.

Thus, the District Court abused its discretion in failing to award First South mandatory prejudgment interest.

### A. First South Is Entitled to Prejudgment Interest on the Breach of Contract Cause of Action.

North Carolina provides for statutory prejudgment interest for breach of contract. N.C.G.S. § 24-5(a) provides that "In an action for breach of contract, except an action on a penal bond, the amount awarded on the contract bears interest from the date of breach."[6] The statutory rate of prejudgment interest is 8% per year. N.C.G.S. § 24-1.

The evidence submitted at trial supports that the date of breach was March 8, 2007. This was the date of the closing of the Burton Creek loan. (Trs. p. 159; 205; 213; 219-225; 249-250; 263-267; 591-593; 915-918; 1050-1055; 1092; 1126-1127; 1162-1163; 1470-1471). On this date, the Defendant violated material terms of the Agreement by closing the loan without obtaining the required material conditions precedent to the loan, such as sewer availability and the Tyson Guaranty. At the

---

[6] A claim for fraud in the inducement has been characterized as a "contract-related tort claim." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999). Thus, interest should run on the claim of fraud from the date of the breach.

52

very latest, the date of breach was when First South funded the loan on March 19, 2007. (Trial Trs. p. 421, 424). Therefore, pursuant to N.C.G.S. § 24-5(a), First South is entitled to prejudgment interest in the amount of 8% per annum from March 8, 2007 until the date of entry of judgment. The prejudgment interest awardable under N.C.G.S. § 24-5(a) totals $1,244,716.98.

### B.    First South Is Entitled to Prejudgment Interest on the Fraud Cause of Action.

Assuming, *arguendo,* the Court should not apply prejudgment interest under N.C.G.S. § 24-5(a), then subjection (b) should be applied to award prejudgment interest on the fraud cause of action.

Section 24-5(b) provides, in pertinent part: "In an action other than contract, any portion of a money judgment designated by the fact finder as compensatory damages bears interest from the date the action is commenced until the judgment is satisfied….Interest on an award in an action other than contract shall be at the legal rate [of 8% per annum]." Thus, prejudgment interest under Section 24-5(b) is calculated from the date the action is commenced until the entry of judgment.

The use of term "compensatory damages" means that prejudgment interest applies only to an award of damages, not punitive damages or treble damages. *Market Am., Inc. v. Rossi*, 104 F. Supp. 2d 606 (M.D.N.C. 2000). First South received a money judgment, exclusive of punitive damages in the amount of

$2,368.232.46. First South is entitled to 1147 days of prejudgment interest on the non-punitive damages found by jury, totaling $594,848.08.

## CONCLUSION

For the foregoing reasons, First South respectfully requests this Court find the District Court erred in (a) entering judgment against First South on the NCUDTPA cause of action; and (b) failing to award prejudgment interest to First South.

## REQUEST FOR ORAL ARGUMENT

First South respectfully requests oral argument on this appeal.

Respectfully submitted,

By: _____
Joel W. Collins, Jr. (Fed. ID#: 224)
Collins and Lacy, P.C.
Post Office Box 12487 (29211)
1330 Lady Street, Sixth Floor
Columbia, South Carolina 29211
(803) 256-2660
(803) 771-4484 (f)

Robert F. Goings (Fed. ID#: 9838)
Goings Law Firm, LLC
914 Richland Street, Suite A-101
Post Office Box 436 (29202)
Columbia, South Carolina 29201
(803) 350-9230
(877) 789-6340 (f)

Date: December 31, 2014                *Attorneys for Appellant First South Bank*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. <u>14-1853</u>                    Caption: <u>First South Bank v. Fifth Third Bank NA</u>

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [X] this brief contains [**13,131**] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [ ] this brief uses a monospaced typeface and contains [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 101/2 characters per inch).

    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 Pt. [*identify font size and type style*]; **or**

    [ ] this brief has been prepared in a monospaced typeface using [*identify word processing program*] in [*identify font size and type style*].


s/    Robert F. Goings_____

Attorney for First South Bank

Dated: December 31, 2014

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 31, 2014 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Frank H. Gibbes, III (#2084)
Gibbes Burton, LLC
fgibbes@gibbesburton.com
308 East Saint John Street
Spartanburg, South Carolina 29302


Alan J. Statman
ajstatman@statmanharris.com
Statman, Harris & Eyrich, LLC
3700 Carew Tower
411 Vine Street
Cincinnati, Ohio 45202



s/     Robert F. Goings

Date:  December 31, 2014